```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2        - - - - - - - - - - - - - - - - X
                                         :
3          In re Meta Materials Inc.     :  1:21-CV-07203 (CBA)(JRC)
           Securities Litigation         :
4                                         :
                                          :
5                                         :  United States Courthouse
                                          :  Brooklyn, New York
6                                         :
                                          :
7                                         :  February 27, 2023
                                          :  2:00 p.m.
8                                         :
                                          :
9        - - - - - - - - - - - - - - - - X :
10           TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
              BEFORE THE HONORABLE CAROL BAGLEY AMON
11                 UNITED STATES DISTRICT JUDGE

12                     A P P E A R A N C E S:

13       For the Movant:          Levi & Korsinsky LLP
                                   55 Broadway, 10th Floor
14                                 New York, New York 10006

15                                 BY:  ADAM APTON, ESQ.

16
         For the Defendant:       WILSON SONSINI GOODRICH & ROSATI, P.C.
17                                 701 Fifth Avenue, Ste 5100
                                   Seattle, Washington 98104
18
                                   BY:  GREGORY LEWIS WATTS, ESQ.
19
                                   WILSON SONSINI GOODRICH & ROSATI, P.C.
20                                 650 Page Mill Road
                                   Palo Alto, California 94304
21
                                   BY:  BETTY CHANG ROWE, ESQ.
22
         Court Reporter:          JAMIE A. STANTON PARISI, RPR, CRR
23                                 Official Court Reporter
                                   Telephone: (718) 613-2274
24                                 E-mail:  JamieStanton.edny@gmail.com

25           Proceedings recorded by computerized stenography.
             Transcript produced by Computer-aided Transcription.
```

*Proceedings*                                          2

1          (In open court.)

2          THE COURTROOM DEPUTY:  Good afternoon, everyone.

3    This is In Re Meta Materials, case number 21 CV 7203 on for

4    oral argument.

5          Can the parties please state their names for the

6    record, beginning with Defendants?

7          MR. WATTS:  Yes, for Defendants, Greg Watts of

8    Wilson Sonsini.

9          MS. ROWE:  Betty Rowe from Wilson Sonsini.

10         THE COURT:  Good afternoon.

11         MR. APTON:  And good afternoon, Your Honor.  Adam

12   Apton from Levi & Korsinsky.  We represent the Plaintiffs.

13         THE COURT:  Good afternoon.  All right, everyone

14   can be seated.  It's easiest to do your arguments sitting

15   because of the way our microphone setup is.

16         Mr. Watts, are you arguing -- you will be arguing

17   for the Defendant?

18         MR. WATTS:  I am, Your Honor.

19         THE COURT:  Do you want to give me your top

20   points?

21         MR. WATTS:  Sure.  May it please the Court, Your

22   Honor.  Meta Materials or Meta, as I will refer to them

23   during today's hearing, is a developer of high-performance

24   meta materials.  Meta materials are composite structures

25   consisting of conventional materials like plastic or glass

1    or other metals that are engineered to exhibit enhancing

2    properties for commercial application.

3           Throughout the punitive class period in the

4    securities class action, Meta repeatedly disclosed that its

5    technologies and products were and are in development and

6    not ready for volume commercialization.  Plaintiffs gripe,

7    it appears, is that development of technologies of this

8    innovative space are not progressing as fast as Plaintiffs

9    like.  But the development of cutting-edge technologies and

10   products takes time and is not guaranteed to result in

11   commercialized profitable market accepted products.  A

12   corporation or individual can lead, advance the science and

13   pioneer technological advances, but, nonetheless, fail

14   commercially.

15          While Meta fully intends to succeed in time, as

16   with any scientific endeavor or investment, there can be no

17   guarantees.  The crux of Plaintiff's case is that Meta

18   fraudulently described itself as a company with products

19   ready for commercialization.  Both their complaint and their

20   opposition focus on the following two phrases.

21          The first phrase is that Meta stated it is quote,

22   now moving toward commercializing products, close quote.

23   The second phrase is that Meta has, quote, scalable

24   manufacturing methods, close quote.

25          These statements did not and could not incur any

1   investor misimpressions that Meta had fully developed

2   products ready for large-scale commercialization for four

3   reasons:

4          Reason number one, the actual language used by

5   Defendants did not convey that Meta had commercial-ready

6   products, but, instead, merely conveyed that Meta was,

7   quote, moving toward commercialization.

8          THE COURT:  What does that mean, "moving toward

9   commercialization"?  What is one to gather from that

10  statement?

11         MR. WATTS:  That the company is taking steps

12  moving towards a goal.  It's a projective statement about

13  the future.

14         THE COURT:  There are two allegations that seem

15  problematic that I would like you to address.  The

16  allegation with respect to -- and I'm probably getting the

17  names wrong, the "nano" technology, that it was dependant on

18  having a license to do it.  And the license had lapsed, so

19  you couldn't have been moving anywhere without the license,

20  without the requisite license.

21         MR. WATTS:  Sure, Your Honor.

22         So during the class period, the only statement

23  made by the company was about the NanoWeb technology, that

24  it was in development and that it was in the early stages of

25  development, that's paragraph 311 of the complaint, and that

1    it is also merely a prototype, also paragraph 311.

2            THE COURT:  That's not something that was claimed

3    to be now moving towards commercialization, that didn't

4    apply to that technology?

5            MR. WATTS:  It's unclear from the statement as to

6    what particular products the company was referring to.  I

7    don't believe this would have been the one, in light of it

8    being in the early stages of development, Your Honor.

9            To get to your particular question about the

10   NANOWEB technology and license, so the company said nothing

11   publicly about the license regarding NANOWEB.

12           THE COURT:  No, but if you don't have one, you

13   can't be developing it, correct?  If you don't have a

14   license to do the technology.

15           MR. WATTS:  I don't believe that's correct, Your

16   Honor.  For example, the NANOWEB technology could have gone

17   past what the patent protected.  The company could have had

18   other patent-protected NANOWEB technology.  There is no

19   allegation that the license was exclusive and picked up by

20   another competitor.  So at some point in time, the company

21   could have repurchased the license, if it deemed fit to do

22   so and worthy of some commercial reason.  So there may --

23           THE COURT:  It developed prototypes, right, or

24   samples I think it said?

25           MR. WATTS:  That's correct.

1          THE COURT:  How did you do that without a license?

2          MR. WATTS:  You don't need the license to develop

3     the product.  You can't commercialize it.  And there is no

4     allegation that they were somehow violating that patent or,

5     therefore, infringing upon the license.  They were

6     developing NANOWEB technology.

7          THE COURT:  All right.  With respect to the

8     glucoWISE, there's allegations that that was totally

9     unproven scientifically.  Why weren't statements regarding

10    the viability of that technology false in light of the claim

11    that they were -- the whole technology was unproven

12    scientifically?

13         MR. WATTS:  So it's important to distinguish

14    between Plaintiff's characterization of my client's

15    statements and the actual statements made by Defendants.

16    Nowhere did the company say that the glucoWISE technology

17    was scientifically proven, ready for commercialization, or

18    even had a product.  All they had said was the following:

19    In the proxy, the February 2021 proxy, the company said

20    nothing about glucoWISE.  The name was never mentioned.

21    While it did mention gluco sensing technology, all it said

22    was that that product was under development, and that

23    additional experiments will continue.  That was all they

24    said in the proxy.

25         In the July 2021 press release, the company said

1    there about glucoWISE, that they were working towards

2    developing a non-invasive gluco sensing "prototype," and

3    that it had not -- was not commercially ready.  They called

4    it a prototype or a prototype concept that they were working

5    towards developing, and they said that it was clear that it

6    was in a laboratory environment and they had not yet done

7    any pre-clinical human studies.

8              Importantly, the company in that very same press

9    release said there were a number of challenges to gluco

10   sensing non-invasive technology and instead they included

11   the weak signature of the glucose molecule, signal

12   interference from other biological substances, and ambient

13   temperature and skin moisture factors.  That's Exhibit EF-1.

14             So Meta was not touting this as scientifically

15   proven.  It clearly disclosed that this technology was a

16   prototype in development, it's very early stages, and it was

17   years away from any commercial use whatsoever.  So there was

18   no misstatement.

19             THE COURT:  What about with regard to the metaAIR

20   eyewear product?  There are slides showing three different

21   colors that it was supposedly able to deflect.  It's

22   apparently undisputed that it only did one color.

23             MR. WATTS:  Yes.  So you are referring to the

24   single slide used in the investor presentation and also in a

25   fact sheet by the company.

1          THE COURT:  Right.

2          MR. WATTS:  There is no indication, if you look at

3   that picture and the description of the technology beneath

4   it, what that picture is of.  Is it of the metaAIR

5   eyeglasses, or is it of the holoOPTIX technology.  Now, it's

6   not in the record, Your Honor, the picture is of the

7   holoOPTIX technology, not of the metaAIR glasses.  Those

8   three colored circles, clearly, are not glasses.  Glasses

9   sit on the bridge of the nose and would have two lenses, not

10  three.

11          When it comes to the allegation of misleading

12  statements about the color and the wavelengths.

13          THE COURT:  Right.

14          MR. WATTS:  So I think it's judicially noticeable

15  that there are many wavelengths of green.  And when a

16  company says they are able to block wavelengths, they were

17  referring to wavelengths of green.

18          Not in the record, Your Honor, but the laser

19  strike technology used to try to blind pilots is typically a

20  green laser.

21          THE COURT:  To do what?

22          MR. WATTS:  Typically a green laser.

23          THE COURT:  I didn't hear what you said earlier.

24  To train?  You said something about pilots.

25          MR. WATTS:  Yes.  So the whole purpose of the

*Proceedings*                                                    9

1    metaAIR glasses or that technology was to prevent laser

2    strikes to blind pilots while flying.  And typically those

3    lasers are green.

4           And then Plaintiffs presume that the failure to

5    block blue and red is a defect.  It could also be a feature,

6    because a pilot must also read an instrument panel in front

7    of him or her which has readouts in other colors, including

8    blue and red.  So if it blocks all blue, all red, all green,

9    they are blind in their instrument panel as well.  So they

10   presume it's a defect as opposed to a feature.  I don't

11   think that's accurate.  But regardless, I mean, the company

12   clearly disclosed where it was in development, how basic it

13   was commercially, and how they had partnered with Airbus and

14   Satair to develop and distribute the product.

15          THE COURT:  All right.  The Section 11, and 14 A

16   claims, it's your position that those sound in fraud or

17   don't sound in fraud?

18          MR. WATTS:  Yes, that they sound in fraud.

19          THE COURT:  And that's because it's the whole

20   overarching theory of the complaint.  But they are different

21   statements, correct?  They are segregated in a different

22   part of -- actually, under the 11 A and 14 A claims and

23   other than the now moving towards commercializing products,

24   they are different and separate statements, correct?

25          MR. WATTS:  No, Your Honor.  I believe that they

1   actually have more overlapping statements than just the ones

2   you referenced.  I believe the other same operative fact

3   allegations would include allegations regarding metaAIR,

4   glucoWISE, NanoWeb, and the lack of high volume production

5   capacity and the Airbus/Satair commercial or partnership

6   relationship.

7           I point the Court to paragraphs 109, 274 and 302.

8           The other reasons why the complaint as to the

9   Section 11 and 14 A claims sound in fraud are because,

10  again, the complaint says, upfront and in their opposition,

11  that the merger was secured through fraudulent means, right,

12  a merger effectuated by a 14 A, a 14 A proxy statement.  And

13  they even say in the opposition, that is what occurred here.

14  And also, you know, they are the same Defendants as to all

15  claims.  They don't try to parcel out those who are fraud

16  Defendants verse those who are not.

17          THE COURT:  Are the same Defendants named in

18  the 11 -- the Section 11 and 14 A claims and the 10 B 5, are

19  they all the same?

20          MR. WATTS:  I believe so, yes, Your Honor.  And,

21  again, also, you know, the overlapping alleged

22  misstatements.  And Plaintiffs try to lean into -- that

23  they've disclaimed a fraud-based claim in their Section 11

24  and Section 14 A portions of their complaint.  But the

25  caselaw is clear they can't do that.  That doesn't get them

1    out of jail free.  They've got to actually have

2    nonoverlapping factual allegations.

3            THE COURT:  Okay.  What about the significance of

4    the statement that LamdaGuard, LamdaLux and LamdaSolar have

5    minimal operational activity?  Plaintiff alleges this is

6    false because they had no activity.

7            Why isn't that an actionable statement?

8            MR. WATTS:  So that, to me, Your Honor, that comes

9    across as semantic nitpicking.  So what they are saying is

10   that for that distinction to be worthwhile to an investor,

11   an investor would have chosen to invest in Meta if the

12   LamdaLux and LamdaSolar divisions had minimal activity, but

13   would not if it had no activity.  That's really the fulcrum.

14   I don't believe that's plausible.

15           It's also clear that, you know, just because

16   divisions are not active or minimally active, doesn't mean

17   they are not developing technologies in other areas, parts

18   of the business that would overlap with those technologies

19   like metaAIR, metaSOLAR, glucoWISE, NanoWeb, etcetera.

20           THE COURT:  What about the manufacturing capacity?

21   Is it your position that you revealed that you didn't have

22   any manufacturing capacity?

23           MR. WATTS:  I wouldn't say any, Your Honor.  We

24   were very clear about what we did have, which was low volume

25   prototype sample-type production capacity.  So, you know,

*Proceedings*                                                    12

1    the phrase they take issue with in their complaint is the

2    phrase, "scalable manufacturing methods," close quote.  And

3    they argue it implies that we were somehow scaling

4    production and distributing our products.  They allege that

5    in paragraphs 114 and 118 of their complaint.  But scalable

6    does not mean scaled.  And having a scalable method does not

7    mean that a company has built or will soon build an actual

8    large volume production line for any particular product.

9    Meta disclosed in the proxy on pages 53 and 54 and on 59

10   that its Canadian facility in Nova Scotia does not have

11   enough space and ability to have production line.  They

12   disclosed --

13                THE COURT:  Was that the only facility?

14                MR. WATTS:  No.  They had one in Pleasanton,

15   California, as well.

16                It also disclosed elsewhere in the proxy that --

17   and this deals with the California facility, again, proxy at

18   pages 50 and 51, that they only produced samples and at

19   small volume scale.  And Meta disclosed in the proxy, the

20   same pages, that while it had plans to scale production,

21   larger scale and volumes, it did not provide any timeline in

22   which it would do so, and that it would require additional

23   growth capital to be able to make that production line -- to

24   build it.

25                And then finally, with respect to the NanoWeb,

1  which, again, as we mentioned, I mentioned earlier, it was

2  in the early development stages, they disclosed in the

3  proxy, on page 60, that they had plans to build a

4  small-scale wafer-to-wafer NanoWeb production line and a

5  pilot-scale roll-to-roll NanoWeb production line.  Again,

6  pilot scale, small scale, they never disclosed that they had

7  a plan to do a large volume production of the NanoWeb.  And

8  again said that producing larger scale and volumes would

9  require additional growth capital.

10         THE COURT:  Okay.  Anything else you want to add

11 before I hear?

12         MR. WATTS:  One last thing, Your Honor.

13         THE COURT:  Okay.

14         MR. WATTS:  And that is, you know, it's my view

15 that in light of the company's language on both moving

16 towards and also scalable methods, but also the fact the

17 company disclosed real risks to the investing public about

18 how these products may never see a market.

19         I'll point you to one quotation from the proxy,

20 which is Exhibit B at page 53, where Meta disclosed, quote:

21 There can be no assurances that such research and market

22 development activities will prove profitable or that the

23 resulting markets and/or products, if any, will be

24 commercially viable or successfully produced and marketed,

25 close quote.

*Proceedings*                                                        14

1          THE COURT:  How do you square that with now moving

2    towards commercializing products?  They seem to be

3    inconsistent statements.

4          MR. WATTS:  Well, actually, no, Your Honor.  For

5    example, one could argue they had commercialized metaAIR,

6    the eyeglasses.  They had sold 50 units.

7          THE COURT:  Well, the statement you just --

8          MR. WATTS:  That was far from successful.

9          THE COURT:  The statement you just read, was that

10   a statement referring to all of the products, though?

11         MR. WATTS:  It was not specific to any particular

12   product.  It was a general statement, yeah.  So you can --

13   you can commercialize a product that failed commercially,

14   right?  If the market doesn't take the product, doesn't find

15   it worth the money.  For example, metaAIR, as Plaintiffs

16   allege, they sold fewer than a hundred pairs of eyeglasses.

17   That was commercialized in some sense.  They were selling

18   them.  Just not to wide demand, unfortunately.  So that can

19   happen.

20         So in addition to the risk the company disclosed,

21   I believe the fourth reason that the complaint should be

22   dismissed is that Plaintiffs have pled themselves out of a

23   claim because they allege in their complaint in several

24   places that the market was fully aware of Meta's production

25   limitations and its failures in product line development.

*Proceedings*                                                        15

1          So for example, in paragraph 49 of the complaint,

2     Plaintiffs allege, quote:  Meta's lack of success at

3     bringing any products to market and had, in fact, cultivated

4     a long list of product and development failures, close

5     quote.  They say investors were aware of this from day one

6     of the class period.  How could investors have been misled

7     that they knew about that on day one of the class period?

8          In paragraph 50, Plaintiffs allege, quote:  The

9     market was skeptical of the Torchlight/Meta transaction in

10    the first place, close quote.

11         In paragraph 75, Plaintiffs allege that the

12    Kerrisdale Capital report, quote, simply reaffirmed, close

13    quote, investors already held skepticism about Meta

14    Materials.

15         THE COURT:  When was that report issued in

16    connection with the stock purchase here, though?

17         MR. WATTS:  That report was issued in December of

18    2021.  The class period starts in September of 2021.  But

19    again, the paragraphs 49 and 50, Plaintiffs allege that it

20    was known from day one, September 21st of 2020, that

21    investors were skeptical of Meta Materials' abilities to

22    actually develop a product.

23         THE COURT:  Does that insulate false statements in

24    reports or proxy statements?

25         MR. WATTS:  I mean, it may not always, Your Honor.

*Proceedings*                                                          16

1   I agree with you on that.  I can see your skepticism;

2   however, I think any time you analyze particularly alleged

3   misstatements, you must view it in context of the overall

4   disclosures by the company.  So for example, investors

5   should be presumed to have been aware of the company's other

6   public statements when it reads a press release or reads a

7   class period misstatement.

8           THE COURT:  Well, are these the company's

9   statements, though, or someone else's statements?

10          MR. WATTS:  Company statements.  So for example --

11          THE COURT:  The market skeptical statement was

12  something the company said?

13          MR. WATTS:  No.  That's what Plaintiffs allege in

14  their complaint.

15          THE COURT:  Oh.

16          MR. WATTS:  Yeah.

17          THE COURT:  Okay.

18          MR. WATTS:  Which is why I argue that they pled

19  themselves out of the claim.  But as far as, you know,

20  context mattering, when you consider an alleged false

21  statement, I point the Court to several decisions from the

22  2nd Circuit on this.  One is Ganino, at 167.  In that case,

23  the Court said that if the information is already known to

24  the market, the misrepresentation cannot then defraud the

25  market.

1          This Court's decision in Emerson, at 245 and 246,

2   which quotes, the 2nd Circuit's international paper

3   decision.  There the Court said that, you know, in analyzing

4   an alleged misstatement, it must be viewed in the context of

5   the total mix of information and that total mix includes

6   information already in the public domain and facts known or

7   reasonably available to shareholders at the time.

8          THE COURT:  But with regard to the report that's

9   referenced, the one that talks about what a terrible company

10  this was, are there stock sales alleged -- in other words,

11  does the period of sales here post date that report?

12         MR. WATTS:  Yes.  So Plaintiffs punitive class

13  period extends from September 21st of 2020 through July --

14  let me get the right date, here, Your Honor -- to July 24th

15  of 2022.

16         THE COURT:  So --

17         MR. WATTS:  Sorry, June 24th of 2022.  And the

18  Kerrisdale Capital report came out on December 14th of 2021.

19         THE COURT:  So would it be your position that any

20  stock after that report couldn't possibly be actionable, any

21  sale?

22         MR. WATTS:  Yes, as I argue, as Plaintiffs argue

23  in their opposition and also in their complaint that this

24  Kerrisdale report basically validated or reaffirmed investor

25  concerns about Meta Materials and that it was a thorough

1   report and, in fact, if I can quote the actual language,

2   they say -- hold up, here.  Here we go.  Yeah, they say that

3   that report, in paragraph 75, that it thoroughly documented

4   exactly how Meta consistently and materially mislead the

5   investing public and that for investors who were already

6   skeptical of Meta and the merger simply reaffirmed how Meta

7   habitually made outlandish and misleading claims about the

8   feasibility, development and commercial potential of various

9   technologies.

10          So it's my position the whole case should be

11   dismissed, but if for some reason it's not, the class period

12   cannot extend beyond that Kerrisdale Capital report, because

13   they allege in their own complaint that they put everybody

14   on notice about all the alleged fraud, all the alleged

15   grandiose statements about the products and development and

16   that's where the class period should end.

17          And I would point the Court to the Barclays

18   decision at 97 from the Southern District which supports

19   that -- and I'll quote that case.  In Barclays, like I just

20   said, quote:  In the case of a securities fraud class

21   action, courts are required to cut off the class period on

22   the date of a statement or event that cures the market,

23   close quote.

24          THE COURT:  Okay, thank you.

25          Counsel, let me just ask you to address that

1    first.  You have alleged this report was out there as part

2    of the market mix.  How could anybody have been mislead

3    after that report issued?

4                MR. APTON:  Sure, Your Honor.  So one component of

5    the case, and this ties into our theory of lost causation.

6                Is this mic on?

7                THE COURT:  Yes, I can hear you.

8                MR. APTON:  Thank you, sorry.

9                One component of our theory of lost causation is

10   that this merger was consummated, at least in part, to

11   provide access for the Canadian Meta Materials company to

12   gain access to the public markets here in the United States.

13   Cash was desperately needed and as soon as this merger was

14   in the works, they started to take advantage of that and so

15   the June 2022 follow-on offering or cap raise was really the

16   culmination of everything that was already in the works.

17   Kerrisdale Capital, in December of 2021, certainly caused

18   damages, put people on notice.  But in terms of when the

19   fraud was -- I'm not personally a fan of this expression,

20   but when it was fully revealed, when Defendants conducted

21   this final dilutive offering in June of 2022, I mean, it hit

22   people hard.  It took whatever value was left in the stock

23   and just wiped it out.  And so that's why we continued the

24   class period to that point in time, Your Honor.

25                THE COURT:  But how does it cover people who made

1   purchases after the report?  I know that you are saying

2   people that were holding the stock at the time the report

3   came out, that's something different.

4              MR. APTON:  Sure.

5              THE COURT:  But how would it cover investors who

6   purchased after that report was issued?

7              MR. APTON:  So as representatives of the class,

8   there are investors who did purchase after Kerrisdale

9   Capital report.

10              THE COURT:  Right.

11              MR. APTON:  Or even, frankly, those who purchased

12   before Kerrisdale Capital.

13              If Your Honor is willing to let us take discovery

14   and try to prove this theory of lost causation, it may well

15   show, the record of discovery may well show that the market

16   was not -- the fraud was not fully revealed until this final

17   dilutive offering in June of 2022.

18              THE COURT:  But hard to be nastier about the

19   company than the report was, right?

20              MR. APTON:  The truth is not always flattering,

21   that is true, that is true, Your Honor.

22              THE COURT:  But I mean, why wouldn't it all have

23   been out there at the time of that report?  I don't

24   understand what you think would have been going on later.

25              MR. APTON:  Sure.  You know, it's a tough question

*Proceedings*                                                        21

1    to answer, respectfully, Your Honor, because I don't

2    presently have the discovery necessary to answer the detail

3    that Your Honor is probably looking for.

4          Lost causation is traditionally pled under Rule 8,

5    and so if given the opportunity, that would certainly be a

6    topic or an area of inquiry that we focus on as the case

7    progresses.

8          THE COURT:  Well, what would you hope to show

9    through discovery?

10         MR. APTON:  Well, that analysts or investors were

11   not persuaded by the Kerrisdale Capital report.  That they

12   believed George Palikaras and Ken Rice, who were the CEO and

13   CFO of the surviving entity, that products were moving

14   towards commercial developments, they had scalable

15   manufacturing methods, and they were about to turn this

16   corner.  And then what happens?  They revert to their old

17   ways.  They conduct this dilutive offering again, and

18   everything is gone at that point.

19         THE COURT:  Did you want to address the other

20   points Counsel made?

21         MR. APTON:  Yes, Your Honor, if I may.

22         So Your Honor's first question, well, first of

23   all, I do want to -- there are an awful lot of inconsistent

24   statements made by Defendants.  Not here today, but in the

25   process.

*Proceedings*                                                        22

1            THE COURT:  You mean in their statements; not by

2    Counsel?

3            MR. APTON:  No, I have a great deal of respect for

4    Mr. Watts.  But there are a lot of inconsistent statements.

5    And so under the caselaw, and I'll refer the Court, if

6    necessary, to the Omega Healthcare case, that's 2nd Circuit

7    from 2020.  It's pages 19 of my opposition.  When Defendants

8    make a statement, they are required to speak accurately and

9    truthfully and fully about that statement.  They cannot make

10   statements that would -- or not make statements that would

11   render other statements misleading.  And so, you know, we

12   have a statement, the one that Mr. Watts and Your Honor

13   referenced at first, now moving toward commercializing

14   products.  And Your Honor asked Mr. Watts, does that include

15   the holography, the lithography, the metaAIR, the various

16   products?  And, you know, Mr. Watts said it was unclear.

17            In paragraph 272, that's an excerpt of that

18   particular statement, and after the now moving toward

19   commercializing products, quote, unquote, statement, the

20   very next sentence is Meta's platform technology includes

21   holography, lithography, medical wireless sensing, referring

22   to the glucoWISE product.  And so my reasonable -- I think

23   it's reasonable reading of this excerpt in the proxy

24   statement and it appears repeatedly in other SEC filings and

25   public statements is that this, quote, now moving toward

1    commercializing products, close quote, statement and the
2    scalable manufacturing method statement applies to all of
3    Meta Materials's products.  It's not limited to just some
4    here, some there, which, by the way, is not specified
5    anywhere.  You have this mantra, if you will, that's being
6    fed to investors time and again, that the company, despite
7    its past failures, it is now moving toward commercializing
8    products.  It has scalable manufacturing methods.  To an
9    ordinary investor, a reasonable investor, this means Meta
10   Materials is ready to go.  And that's why people invested.
11   And so Your Honor, I would say that while the market was --
12   and we do allege that the market was skeptical of Meta
13   Materials' past performances or failures, these statements
14   are highly material for that particular reason.

15           THE COURT:  So you think the significant word is
16   "now"?

17           MR. APTON:  Well, I -- yes, I do think in -- yes,
18   "now" is certainly a significant word, but a very more
19   significant word perhaps or equally significant,
20   "commercializing."  That's a specific term.  If the Court
21   has looked at the QuantumScape case, on pages 14 to 16 of my
22   opposition, I cite three different cases.  The first is the
23   QuantumScape case.  And that QuantumScape case illustrates,
24   I think quite well, actually, that when a company says it's
25   ready to do something or will do something or, specifically,

*Proceedings*                                                    24

1   it's ready to commercialize, that's what they say in

2   QuantumScape relating to their product, which happened to be

3   solid state matters.  That means all other obstacles --

4          THE COURT:  Well, that was a little bit more

5   specific statement.  It said it was ready to commercialize.

6   Not now moving towards.

7          MR. APTON:  True.  In fact, in QuantumScape, it

8   actually qualified the commercialization statement by saying

9   that the only major step remaining was -- sorry, I lost my

10  line of sight, here.  It said that it was ready to -- ready

11  for commercialization with the only remaining steps being

12  ramping up production.  Meta Materials doesn't even qualify

13  their statement.  They just say that they are now moving

14  toward commercializing products and they have scalable

15  manufacturing methods.  I see that as -- this case is, I

16  guess, worse or more egregious or more false than the

17  statement in Quantum's.

18         THE COURT:  What about all of the disclaimers,

19  though, that Counsel has referenced?

20         MR. APTON:  Well, that goes to what I was getting

21  at initially, Your Honor, with the Omega Healthcare case.

22  And actually, it came up in QuantumScape, too.  A company

23  can't make a boatload of grandiose fanciful statements, and

24  then at the very end, in some small footnotes, disclaim

25  everything it said prior.

*Proceedings*                                                        25

1          THE COURT:  Was it small footnotes that they were

2    disclaiming?  Was it in small footnotes somewhere, or in the

3    body of the statement you are complaining about?

4          MR. APTON:  Fair enough.  I suppose it would be in

5    the same font size in the cautionary language.  I don't know

6    where exactly Counsel found the risk warning or the language

7    that he referred to before he ended his presentation, but I

8    would -- was it -- can I ask Counsel, was it in an annual

9    report, that risk warning?

10         MR. WATTS:  It's in the proxy for sure.

11         MR. APTON:  It's in the proxy.  I mean, that was a

12   very nondescript general disclaimer about we may never get

13   to -- I'll paraphrase, we may never successfully sell our

14   products and make a profit.  Every company that files

15   anything with the SEC that makes a product probably has a

16   risk warning similar --

17         THE COURT:  That's because they don't want to be

18   sued by you.

19         MR. APTON:  Well, there are other ways not to be

20   sued by firms like mine.

21         THE COURT:  That was not meant at all to be

22   disparaging towards your --

23         MR. APTON:  No, Your Honor, I didn't take it as

24   such.

25         THE COURT:  Are there any other points you want to

1    highlight?

2                MR. APTON:  Yes, Your Honor.

3                Defense Counsel, in their brief, made a point

4    about arguing our case should be subject to a heightened

5    pleading standard.

6                THE COURT:  Right.

7                MR. APTON:  It shouldn't be.  Section 11 is

8    traditionally judged under Rule 8 at this point.  The Fresno

9    v. comScore case really provides a strong reading on the

10   current status of the law.  I can give the Court that cite

11   if it would like.

12               THE COURT:  But there are other cases that talk

13   about if you have the same basic theory of fraud in your

14   complaint and it effectively covers the Section 11 and 14 A

15   claims that you are stuck with having alleged fraud.

16               MR. APTON:  Well, sure, Your Honor, yeah.  If

17   there are exact overlap.

18               THE COURT:  Does the overlap have to be exact?

19               MR. APTON:  Well, so, Your Honor, in Fresno v.

20   comScore, it would suggest that, yeah, it needs to be.

21   Fresno v. comScore really does provide a good illustrative

22   or tutorial on when Section 11 should -- sorry, when Rule 8

23   should apply to Section 11 claims and when Rule 9(b) should

24   apply.

25               I just want to point out or correct Counsel.  Not

*Proceedings*                                                    27

 1    all the Defendants are the same across the counts.

 2            THE COURT:  I thought that would -- I recognize

 3    that.

 4            MR. APTON:  Thank you, Your Honor.

 5            And though I am not making any concession, even if

 6    Rule 9(b) were to apply, we still meet that standard.

 7    Rule 9(b), if you look at Rombach v. Chang, which dates back

 8    to the Casmas v. Hassett case, you just need four

 9    requirements to meet the pleading standard on Rule 9(b).

10    Specify the statements, we have done that, identify the

11    speaker, we've done that, state where and when the

12    statements were made, done that, and explain why the

13    statements were fraudulent, which we've done that.

14            THE COURT:  Do you need scienter?

15            MR. APTON:  No, you don't need scienter, Your

16    Honor.

17            THE COURT:  You only need it under 10(b).

18            MR. APTON:  And that's where the PSRA the

19    heightened pleading standard weighing of inferences come

20    into play which for our 10(b) claims, we do satisfy that

21    standard.  We do not have general corporate motives here, as

22    Counsel has argued.  We have very particularized financial

23    interests.

24            THE COURT:  Why aren't they the same financial

25    interests with regard to every shareholder?

1                 MR. APTON:  Oh, I'm sorry, I meant the Defendants'

2      motive.  The Defendants' financial interests.

3                 THE COURT:  Right.

4                 MR. APTON:  Oh, I see your question, Your Honor.

5                 THE COURT:  Yes.

6                 MR. APTON:  My apologies.  So let's take Brda and

7      McCabe, who are CEO and chairman of the Torchlight entity.

8      They were on the brink of financial ruin.  Brda, who was the

9      CEO, his salary was being unpaid accrued.  He was owed

10     several hundred thousand dollars by the company for

11     day-to-day work.  He had McCabe, who had personally invested

12     millions of dollars in keeping the company afloat.  If they

13     could affect a change of control, Brda gets cashed out, he

14     gets his bonus, he gets his options accelerated which were

15     worth $9 million at the time of the merger.  McCabe gets to

16     keep his legacy oil and gas interests.  He gets to decide

17     when they are going to be sold.  You don't get tossed into

18     some bankruptcy court to creditors and debtors.  Whereas,

19     Meta Materials, they got access to the NASDAQ.  That's

20     significant.  They were able to immediately start raising

21     badly needed capital, which, by the way, they needed so bad

22     because they were in breach of a debt covenant with one of

23     their creditors at the time.  So these are not the ordinary

24     general corporate motives that courts typically reject in

25     unsuccessful cases.

*Proceedings*                                                    29

1          THE COURT:  Okay.  Anything else you need to?

2          MR. APTON:  No, Your Honor.  I don't think so.

3          THE COURT:  Okay.

4          MR. APTON:  Thank you.

5          THE COURT:  Thank you.  Do you have anything you

6   desperately needed to address?

7          MR. WATTS:  Your Honor, I'm always desperate for

8   one more word, but I do have -- it will take two minutes.

9          THE COURT:  Okay, sure.

10          MR. WATTS:  Thank you, Your Honor.

11          With respect to the Kerrisdale Capital report,

12   while admittedly, that is an unflattering report, as you

13   mentioned, however, let's remember who the authors are.

14   These are short sellers.  Their motivation is to drive the

15   company stock price down so they can profit from that

16   depressed price.  That is their motivation.  They disclose

17   that throughout and the back of the that report.  So that is

18   their motivation.  Everything they say should be taken with

19   a grain of salt because that is what they do, that is their

20   business model.  Number two, Plaintiff mentions that the

21   class period should only end once there was, in his words, a

22   dilutive offering.  There were many offerings during the

23   class period.  The least -- one of the lower dollar amounts

24   raised during that class period was the one that ended the

25   class period for 37 and a half million.  There was a much

1   larger one in middle class period.  The one point I want to

2   make sheer is that every offering is dilutive, by function

3   of issuing more securities, you are diluting those who

4   already own the security.  That's how offering works.

5   Number three, he mentioned that the moving towards language

6   clearly, in his mind, should apply to every product that

7   Meta Materials develops.

8           THE COURT:  All right.

9           MR. WATTS:  And, therefore, it infects the entire

10  business.  Well, as you walked me through during my opening

11  presentation, we went through NanoWeb, metaAIR, and I shared

12  with you the actual specific disclosures about those

13  technologies being in development in their early stages.  So

14  clearly there is way more out there in the proxy statement

15  and elsewhere about the actual status of those products than

16  just the generalized language he wants to hang his hat on

17  which is moving towards commercialization.

18          THE COURT:  No, but you don't disagree that moving

19  towards commercialization applied to all of the products?

20          MR. WATTS:  No, I'm saying I don't know what it

21  applied to.

22          THE COURT:  Well, how would someone reasonably

23  read it, then, if you don't know what it applied to?

24          MR. WATTS:  Well, so in the very same document --

25          THE COURT:  Right.

1           MR. WATTS:  -- up top, they say now moving towards

2     commercializing products.  And then throughout the rest of

3     the proxy, they disclose where they are as to each of these

4     products.  So if a reasonable investor were to read the

5     proxy, they would say, okay, they're moving towards

6     commercialization, at least of metaAIR, where they have

7     these eyeglasses they are selling to the market, but clearly

8     it doesn't apply to NanoWeb because they've disclosed that

9     NanoWeb is in its early stages of merely a prototype.  It

10    doesn't apply to other technologies because clearly they are

11    only in development and not ready for commercialization.  I

12    don't think you can pull that language across.  Regardless,

13    Your Honor, that type of language --

14          THE COURT:  Yes?

15          MR. WATTS:  -- that has been found by courts to be

16    nothing but inactionable puffery.  So for example, I will

17    point the Court to the Aratana case, Southern District of

18    2018, pages 757 and 758, where the Court found the following

19    statement to be immaterial, puffery and inactionable:  The

20    company said they had, quote, made remarkable progress

21    towards commercialization of a drug and that they were,

22    quote, on track to have these products reach the market in

23    2016, close quote.

24          So that statement was viewed as being mere

25    puffery.  And in that statement, the company actually

1    pinpointed when they would have the products hit the market.

2            THE COURT:  Which case is that, that you are

3    making reference to?

4            MR. WATTS:  That's Aratana SDNY 2018 at pages 757

5    and 758.

6            Another case, similar, is the NVE decision out of

7    the Federal Court in Minnesota at page 901.  There, the

8    company said, quote, it was in a good position to capitalize

9    on the commercialization of EMRAM technology, and would be

10   in production at the same time as a competitor.

11           Again, that statement was found to have been

12   immaterial puffery because of the moving or the

13   commercialization-type language, like here.  And they,

14   again, pointing to a point in time when they would have

15   those products on the market the same time as the

16   competitor.  That is something Meta Materials did not do.

17           THE COURT:  Anything else?

18           MR. WATTS:  Last point, and one apology.  The last

19   point is that on the heightened pleading standard whether it

20   be Rule 8 or Rule 9(b), in my opinion, their complaint even

21   fails to satisfy Rule 8 because of the implausibility of

22   their complaint when you read all the allegations in toto.

23   And then when it comes -- and the apology, Your Honor, the

24   Plaintiff is correct.  There isn't a complete synchronicity

25   or overlap of the Defendants in the securities act and

*Proceedings*                                                    33

1   exchange act claims; however, all Defendants are in the

2   fraud-based claim and they peel out just Mr. Palikaras and

3   Mr. Rice from the securities act claim.  That's all, thank

4   you.

5              THE COURT:  Thank you, both.

6              MR. APTON:  Thank you, Your Honor.

7              (Matter concluded.)

8                   *      *      *      *      *

9

10  I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

11

12     /s/ Jamie A. Stanton                February 27, 2023

13  _____    _____
        JAMIE A. STANTON                   DATE

14

15

16

17

18

19

20

21

22

23

24

25